IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2018 Session

## NICHOLAS KEITH PHILLIPS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. F76822     Royce Taylor, Judge**

---

### No. M2018-00058-CCA-R3-PC

---

In this State appeal, the State challenges the post-conviction court's grant of relief to the petitioner in the form of a new trial for his 2013 Rutherford County Circuit Court jury convictions of two counts of rape of a child and two counts of aggravated sexual battery. The State asserts that the post-conviction court erred by concluding that the petitioner was deprived of the effective assistance of counsel at trial and that, but for counsel's deficient performance, the results of the petitioner's trial would have been different. Because the evidence preponderates against the findings of the post-conviction court, we reverse the ruling of that court and vacate the order granting post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed and Vacated**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellant, State of Tennessee.

Kevin R. Bragg, Murfreesboro, Tennessee, for the appellee, Nicholas Keith Phillips.

### OPINION

A Rutherford County Circuit Court jury convicted the petitioner "of two counts of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony," and the trial court imposed "an effective [40]-year sentence to be served at 100" percent release eligibility by operation of law. *State v. Nicholas Keith Phillips*, No. M2013-02705-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Nashville, Jan. 27, 2015).

At the petitioner's trial, Rutherford County Sheriff's Department dispatcher Rachel Mullins testified that she answered the victim's January 20, 2012, 9-1-1 call; the 12-year-old victim reported that the petitioner, her mother's boyfriend, "had tried to rape her" while she was napping. *Id.*, slip op. at 2. The victim told Ms. Mullins that the petitioner had placed his "'thing'" on her leg and "told her, '[I] thought that's what [you] wanted.'" *Id.* Officer Dennis Ward responded to the victim's call. Officer Ward recalled "that the victim was crying and shaking" when "he asked her what was going on." *Id.* "The victim told him that she had gone into the back bedroom and was lying with the appellant, who was rubbing her back. She felt his penis on her leg and saw a wet spot on her jeans." *Id.* When asked on cross-examination "if the victim's mother seemed shocked by the victim's allegations," Officer Ward responded, "'I'm not sure shocked is the exact word that I would use. Concerned, upset.'" *Id.* Officer Ward indicated that the victim's mother did "'[n]ot necessarily'" appear to doubt the victim's report of abuse. *Id.*

The victim's mother testified that on January 20, 2012, the petitioner "telephoned and told her that the victim had locked him out of the house." *Id.*, slip op. at 3. "She tried calling the victim, but the victim would not answer the phone." *Id.* When she arrived home, the victim's mother found a police officer in the living room "talking with the victim 'about different things, subjects like the planets and drawing pictures with her and stuff.'" *Id.* The officer "would not allow the victim's mother to speak with the victim until a detective arrived." *Id.* The victim's mother exchanged text messages with the petitioner but did not tell the police officers that she had done so. The victim's mother said that officials told her that the victim could not remain in the home that night, so she drove the victim to a friend's house. As they drove, she spoke with the petitioner over the telephone, and the conversation was recorded by the petitioner's "laptop webcam" and played for the jury. The petitioner refused her suggestion that he go to the police, saying, "'Darling, I cannot go and talk to the officers . . . . The whole pants thing has me scared [sh* *less], though, because she was grinding on me . . . . Yeah, I had an erection because she kept touching my [di* *]!'" *Id.*, slip op. at 3-4.

During an interview with "a woman from DCS," the victim's mother "said that the appellant owned a laptop computer and that, prior to this incident, he 'had it in my room for a while. And then he had it in [the victim's] room for a while.'" *Id.*, slip op. at 4. She said that the petitioner must have taken the laptop to his mother's house. The victim's mother testified that although the victim had only initially claimed that the petitioner had rested his penis on her leg, "about two weeks later, the victim 'finally came out' and told her about the vaginal penetration." *Id.*, slip op. at 5.

The victim testified that on the evening of January 20, 2012, she and "her brother were watching a movie in the living room, and the [petitioner] was playing his Xbox in her mother's bedroom." *Id.*, slip op. at 5. After her mother "left the home to pay

taxes," she "went into her mother's bedroom to watch the [petitioner] play and sat on the bed." *Id.*, slip op. at 5-6. The victim said that the petitioner then "turned off the Xbox, turned off the light, and asked the victim, who was wearing jeans and a shirt, if she wanted him to rub her legs." *Id.*, slip op. at 6. The victim replied in the affirmative and lay on her stomach. The petitioner, who was fully clothed, then "rubbed her 'thighs and below' over her clothes." *Id.* When the petitioner rubbed her buttocks, the victim initially "'thought it was an accident'" but nevertheless "rolled onto her side 'to see if he wouldn't do it again.'" *Id.* The petitioner then pulled her onto her back and "unbuttoned her pants, put his hand inside her jeans and underwear, and put his finger inside her vagina." *Id.* The victim testified that she pretended to sleep because "she felt '[w]eird' and '[u]ncomfortable' and . . . did not know what to do." *Id.* (alteration in original). The victim "said that the [petitioner] took his hand completely out of her pants for '[p]robably about a couple of seconds' and that he 'put it in again.'" *Id.* (second alteration in original). The petitioner "put his finger inside her for a second time and then took his hand out of her pants again," and "she heard him making sounds 'like something felt good.'" *Id.* At that point, "she sat up, and . . . saw his 'thing' on her leg. She said that she could not see if he was clothed but that she could see his 'private.'" *Id.*

"The victim testified that she got up, told the [petitioner] to stop, and ran" to the petitioner's mother's house next door. *Id.* When she realized that the petitioner's mother was not home, she "ran into the field behind the duplex and toward a friend's house" before the petitioner "caught her and said, '[P]lease stop. I thought that's what you wanted.'" *Id.* (alteration in original). She then ran "into the house, locked the door, and called 911." *Id.*

"The victim said she did not reveal the penetration initially because she was afraid she would get in trouble for not stopping the [petitioner] sooner than she did." *Id.*

The victim admitted during cross-examination "that she was jealous of the attention her mother gave the [petitioner]," "that she did not like him," and that "[s]he often thought that if the [petitioner] was not involved with her mother, her mother would spend more time with her." *Id.*, slip op. at 7. "She also acknowledged that sometime prior to this incident, she hid in her mother's bedroom closet while her mother and the [petitioner] were intimate." *Id.*

Following the petitioner's arrest, the police "executed a search warrant on the [petitioner's] parents' home and collected the [petitioner's] red computer." *Id.*, slip op. at 8. "Matt Stephenson, a special agent with the United States Secret Service, testified as an expert in electronic crimes recovery that he received the [petitioner's] red laptop computer from the RCSD and 'pull[ed] the data off' the computer's hard drive." *Id.*, slip op. at 9. He said that "[t]he computer had an 'active' webcam and 'a piece of

software that support[ed] video type play.'" *Id.* Agent Stephenson played three of the videos obtained from the petitioner's laptop for the jury.

The petitioner's stepfather testified on the petitioner's behalf that "he 'didn't like the vibe [he] got' from the victim's family, that the victim's mother was 'a little uppity,' and that the victim appeared to have 'issues.'" *Id.* (alteration in original). He said that after receiving a handmade greeting card from the victim in December 2011, "he told his wife never to leave him alone with the victim." *Id.* During cross-examination, the petitioner's stepfather identified the card the victim had given him; "[i]nside the card, the victim had written, "Dear Mr. Richard, I hope your life will be last-longing and enjoyable! I think you are very nice and fun to be with! Hope you have a nice weekend!'" *Id.* He said that he had told the petitioner that "there's something wrong with" the victim.

The petitioner filed a timely petition for post-conviction relief on December 20, 2016. He claimed entitlement to post-conviction relief on grounds that his conviction was based on the use of unconstitutionally obtained evidence, that the State withheld favorable evidence, that his convictions violated principles of double jeopardy, that the grand and petit juries were unconstitutionally composed, and that he was deprived of the effective assistance of counsel. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, honing his grounds for relief into claims his counsel performed deficiently by failing to provide him with a copy of the discovery materials, failing to proceed on a timely-filed motion to suppress, failing to interview witnesses prior to trial, failing to introduce evidence of the victim's character for untruthfulness, failing to investigate an allegation that a member of the petit jury was aware of information gleaned during the presentation of the case to the grand jury, and by failing to ask that the jury be sequestered. The petitioner also claimed that the State engaged in witness tampering by permitting relatives of the victim to coach her during her testimony and by permitting State's witnesses to remain in the courtroom in violation of the rule of sequestration; that the search warrant used to obtain his laptop computer was invalid; and that the State failed to disclose prior forensic interviews of the victim that "contained inconsistencies in her testimony which would have ultimately been favorable to the [p]etitioner." In his second amended petition for post-conviction relief, the petitioner added a claim that his counsel performed deficiently by failing to file a motion pursuant to Tennessee Rule of Evidence 412 regarding the victim's prior sexual conduct.

At the August 29, 2017 evidentiary hearing, the petitioner testified that trial counsel was appointed to represent him in December 2012 and that his trial occurred in February 2013. He said that he did not feel that counsel had adequate time to prepare for trial. The petitioner said that his total interaction with counsel prior to trial "was

-4-

probably limited to about 30 minutes, 45 minutes at the most." The petitioner acknowledged that he rejected multiple plea offers from the State and maintained his innocence throughout the proceeding.

He testified that he tried "to bring up the search warrant issue" a number of times but that counsel told him that it "was a non-issue at the time." The petitioner said that his previous counsel had filed a motion to suppress the evidence obtained pursuant to the search warrant but that counsel did not act on the motion until the day of trial. At that point, the trial court told counsel "something along the lines of too late" and denied the motion.

The petitioner testified that during the victim's trial testimony, "[t]he DA's and the parents of the victim" would "shak[e] their head in the direction that they would like their witness to testify in." He said that he notified trial counsel, but trial counsel did not object or otherwise question the witness about it. He said that he also repeatedly advised counsel that the victim had a reputation for untruthfulness, but counsel "advised that it would be in ill favor to go after the credibility of someone like that." When he told counsel about the victim's previous sexual activity, counsel told him "there was no way we could get that up on the stand."

The petitioner said that he became aware that counsel "had previously had a stroke" and that, as a result, counsel "would lose focus and track of certain things." He said that "it was not well for [counsel] to speak in front of crowds like that."

During cross-examination, the petitioner testified that he had asked the trial court to relieve counsel prior to trial "because [he] didn't feel that [counsel] had [his] best interest at heart." He said that the State used the recording from his laptop, which was "mostly just audio of [the petitioner] talking in the background," to "cast [the petitioner] in a negative aspect." The petitioner agreed that the only recording from the laptop introduced at trial was the audio from his telephone conversation with the victim's mother. During that conversation, the petitioner said that the victim had come onto him. The petitioner acknowledged that a separate charge related to photographs and video recordings of the victim in various states of dress on his laptop had been severed prior to trial upon counsel's motion.

Trial counsel testified that he suffered a stroke in 2000 and that the stroke caused him to have aphasia. He said that, other than the aphasia, his stroke had no impact upon his representation of the petitioner. Counsel said that the petitioner maintained his innocence and that he was eager to go to trial. Counsel recalled that he was appointed to represent the petitioner at the end of October 2012 and that the trial was scheduled for February 2013. During the three months before the trial, counsel visited the petitioner on

"at least four" occasions for "an hour or more." At some point, the State made a plea offer that included a 10-year sentence, but the petitioner "couldn't make a decision either way."

Counsel acknowledged that the petitioner told him about the victim's previous sexual activity, but he said that the claim "was very hard to investigate" because neither the victim nor her mother would consent to an interview. He said that he did not file a Rule 412 motion prior to trial, explaining, "[T]he accusation was made against her. She didn't volunteer. It was made against her. . . . I was trying to be very careful and walk on a very slim margin to get as close to it as I could to find out without going over the edge." Counsel admitted that he did not proceed on the motion to suppress filed by the petitioner's previous attorney until the day of trial, saying that he "honestly didn't feel like there was – that we had a good chance of getting that thing appealed – that proved." He conceded that the search warrant contained numerous errors and issues.

Counsel also admitted that the petitioner told him about inconsistencies in the victim's account of the offenses and that the forensic interviews and letters written by the victim supported the petitioner's claim. Counsel did not use any of these items to impeach the credibility of the victim or her mother.

Counsel testified that he had the charge related to the photographs of the victim on the petitioner's laptop severed from the other charges. He admitted, however, that he did not object to the admission of the video recording of the laptop at trial, saying that he thought it would be helpful for the jury to "hear something that he was proclaiming his innocence throughout the entire matter."

In the written order granting post-conviction relief, the post-conviction court found that trial counsel failed "to proceed on a timely filed Motion to Suppress; to devote the necessary time and effort to zealously defend [the petitioner]; and[] to attempt to impeach the credibility of the two key witnesses at trial. These errors resulted in prejudice toward the [p]etitioner." The court observed that "there are several issues that render [counsel's] overall performance deficient, but they are all connected by a singular thread: lack of preparation." The court determined that the time that counsel "allocated to this case was simply not enough to gain a full understanding of the facts and accompanying legal issues." The court pointed to counsel's claim for attorney fees as evidence of his allocating insufficient time to the petitioner's case. The court noted that the claim indicated that counsel spent a total of 26.4 out-of-court hours on the petitioner's case and that 10 "of those hours came within two days before trial began" such that counsel spent only 16.4 hours on the petitioner's case during the 15 months preceding the trial. The post-conviction court found that the record contained "hundreds of pages of discovery, multiple statements from multiple witnesses, and *31 hours of audio/visual*

*discovery*," and concluded that "[e]ven the most charitable of calculations show that [counsel] spent a mere <u>5.1</u> hours with these audio-visual files." The court also noted that counsel "spent a total of <u>26.4</u> hours on a case that would take <u>30.5</u> hours at trial."

The post-conviction court acknowledged "the deference due counsel when reviewing trial strategies and allocation of time and resources" but concluded that "there is no (winning) strategy that calls for an attorney being ill-prepared." The court determined that counsel's lack of preparation resulted in his failing to timely challenge "a key piece of evidence, the red laptop, and thus his oral Motion [to Suppress] was denied out-of-hand by the trial judge." The court observed that counsel failed to comply with the State and local rules for filing a motion to suppress and that counsel acknowledged when raising the issue on the day trial was set to begin that he "'just saw [the search warrant] this morning'" despite having had 15 months to prepare. (alteration in original). The court also noted that during the discussion of the motion, the district attorney remarked, "'I'm a little confused that [counsel] doesn't know what the evidence is on the morning of trial.'" The court concluded that the motion to suppress was not "a longshot," observing that when defense counsel in the severed charge related to the photographs and video recordings on the laptop "timely filed a Motion to Suppress" the evidence obtained during the execution of the search warrant, "the State simply dismissed the charges."

The post-conviction court also found that counsel's "performance in the cross-examination of" the victim's mother was deficient, noting that counsel failed to "properly impeach" the victim's mother "with a letter she wrote that was *extremely* harsh to the victim, and flatly contradicted the victim's testimony" and then "never introduced this letter into evidence at trial." The court observed that counsel "did refresh her memory, but when she gave testimony that contradicted the letter, [counsel] simply moved on." The post-conviction court acknowledged that "it is always difficult to predict how a jury will respond to any given piece of evidence," but found that "[t]he fact that the letter undercut the twin pillars of the" credibility of the victim and her mother "makes not introducing it under those circumstances deficient performance."

Similarly, the post-conviction court found that counsel's "cross-examination of the victim was also deficient," noting "that the victim had given multiple statements, via letters, that amounted to multiple versions of the testimony she was giving at trial." The court concluded that counsel should have asked the victim about the letters "and then moved the letters into evidence for impeachment purposes" and been prepared "to redact the letters as needed upon ruling by the court." "Instead," the post-conviction court found, counsel "explained that he was merely attempting to refresh the victim's recollection with these letters, and did not intend to introduce them at all." The court characterized counsel's approach as "a grave error because, again, this was *the* key witness in the trial." The post-conviction court found that counsel should have done

"everything in his power to attack the credibility of this witness, and there is seldom a better way of doing this than via a prior inconsistent statement by the witness in question." The court concluded that the victim's age did "not justify or legitimize" counsel's "unreasonable decision not to impeach a witness with prior inconsistent statements."

The post-conviction court found that counsel's "performance in representing the [p]etitioner was unquestionably outside the range of professionally accepted competent representation and deficient." The court concluded that "the impact of errors" in this case was not "difficult to discern or gauge." The court held that, had counsel timely moved to suppress the laptop, "properly impeached the credibility of the State's two key witnesses at trial," and "bothered to spend the requisite time with the discovery for a case of this magnitude, this would have been a completely different trial." The court stated that "[t]he volume and enormity of these errors, without question, give rise to the reasonable probability that the result of the [p]etitioner's trial would have been different."

In this timely appeal, the State asserts the post-conviction court erred by granting relief, pointing out that a large part of the court's ruling was based upon a typographical error in trial counsel's claim for attorney's fees and that the court applied an incorrect standard when reviewing the petitioner's claim that counsel performed deficiently by failing to timely argue the motion to suppress. The petitioner concedes that the court's ruling contains "an error in calculation" but argues that the error is not fatal to the court's conclusion that counsel failed to prepare and that the lack of preparation prejudiced the petitioner. The petitioner also asserts that the post-conviction court did not apply an incorrect legal standard when evaluating the claims for relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a

-8-

claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

As an initial matter, we note that the post-conviction judge was not the same judge who presided over the petitioner's trial. Although the State did not produce the trial record as an exhibit at trial, the State asked the post-conviction court to review the trial record, which, it observed, was still in the possession of this court. The post-conviction court's order indicates that the court did, in fact, review the trial record before issuing its order. Because this court does maintain the original copy of the trial transcript as a part of the record from the petitioner's direct appeal and because the post-conviction court relied upon the transcript in formulating its decision, we will take judicial notice of our own records to assist in our review. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009).

*Lack of Preparation*

The post-conviction court found that trial counsel's handling of the petitioner's case was deficient in a number of ways and determined that the "singular

-9-

thread" connecting each of counsel's deficiencies was "lack of preparation." As prima facie evidence of counsel's failure to adequately prepare himself, the post-conviction court cited trial counsel's claim for attorney fees, which, according to the court, indicated that counsel had devoted only 16.4 hours to working on the petitioner's case over the course of 15 months. As the parties agree, the post-conviction court's conclusion in this regard is based upon an erroneous notation in the claim form that indicates that counsel was appointed to represent the petitioner in November 2011. Both the petitioner and trial counsel testified, however, that counsel was not appointed to the petitioner's case until late November or early December 2012.

The claim form does, however, indicate that counsel spent only 16.4 out-of-court hours on the petitioner's case. The post-conviction court concluded that that amount of time was insufficient to review the "seemingly hundreds of pages of discovery, multiple statements from multiple witnesses, and *31 hours of audio/visual discovery*." The post-conviction court does not suggest, and the petitioner did not present any evidence to support a conclusion, that counsel's alleged failure to review the entirety of the discovery materials led to counsel's overlooking a critical piece of evidence or other fact that might have altered the outcome of the petitioner's trial. It is not enough to say that counsel should have devoted more time to the discovery materials, which is certainly the case here, but the petitioner must show that counsel's failure to review the materials prejudiced the petitioner. In our view, the petitioner has failed to establish any prejudice stemming from counsel's failure to devote sufficient time to the review of the discovery materials. He presented no evidence that counsel overlooked, no witness that might have been discovered, and no portion of any of the audio or visual discovery that might have undermined the outcome of his trial.

*Motion to Suppress*

The post-conviction court also found that counsel's failure to prepare led him to make the "incredibly severe" error of failing "to timely file a Motion to Suppress a key piece of evidence, the red laptop, and thus his oral Motion was denied out-of-hand by the trial judge." As proof of prejudice flowing from counsel's failure to timely move to suppress the laptop, the post-conviction court observed that defense counsel appointed to represent the petitioner on "other charges stemming from the same laptop obtained by the same search warrant" had filed a timely motion to suppress and that "on the day the motion was to be heard, the State simply dismissed the charges."

That the State dismissed related charges on the same day a motion to suppress was to be heard is, in our view, irrelevant to the petitioner's claim. The State could have chosen to dismiss the charges for any number of reasons that had nothing to do with the merit of the motion to suppress. Instead, in order to prevail on a claim that

-10-

his counsel was ineffective for failing "to litigate a Fourth Amendment claim competently," a post-conviction petitioner "must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Stated differently, whether counsel rendered deficient services that prejudiced the petitioner on this matter depends entirely on the merit of the underlying motion.

At the evidentiary hearing, the petitioner testified that he asked trial counsel on more than one occasion about the motion to suppress his red laptop that had been filed by his previous counsel. Counsel testified that he did not attempt to litigate the motion until the day of trial and that the motion was denied as untimely at that point. Apparently, the thrust of the motion was an attack upon the search warrant executed at the home of the petitioner's parents. Neither the motion nor the search warrant was presented as evidence at the evidentiary hearing. Indeed, the petitioner presented no proof at the evidentiary hearing as to the grounds supporting the motion to suppress. As a result, he did not establish that the motion would have been meritorious.

Moreover, even were we to assume that counsel's failure to timely argue the suppression motion was deficient performance, we cannot say that suppression of the red laptop would have affected the outcome of the petitioner's trial. Only three videos obtained from the laptop were played during the petitioner's trial. One was the recorded conversation between the petitioner and the victim's mother. During the recorded conversation, the petitioner told the victim's mother that he could not "'go and talk to the officers. . . . The whole pants thing has me scared [sh* *less], though, because she was grinding on me. . . . Yeah, I had an erection because she kept touching my [di* *]!'" *Nicholas Keith Phillips*, slip op. at 3-4. The victim's mother had already testified to the contents of that conversation before the recording was played. In another recording, the petitioner described to his mother how to use the webcam on the computer. In the final recording, which was, importantly, played at the petitioner's own request, the victim sits in front of the computer playing a video game. The petitioner apparently wanted to play that recording to show what the victim was wearing at the time of the offenses. Even without this proof, the evidence presented by the State would have been sufficient to support the petitioner's convictions. The victim testified that the petitioner rubbed her buttocks with his hand, placed his penis on her leg, and placed his fingers inside her vagina. Although her account of the offenses evolved over time, the jury was aware of these inconsistencies and still chose to accredit her version of events.

-11-

The post-conviction court concluded that trial counsel failed to adequately cross-examine the victim's mother, specifically finding that trial counsel should have utilized a letter to impeach her trial testimony. The "letter," which was introduced as an exhibit at the evidentiary hearing, is a single type-written page that is neither signed nor addressed to any person. Based upon the language used, it appears to have been written by the victim's mother. In the letter, the victim's mother indicates that the victim was jealous of her mother's relationship with the petitioner, that the victim had been viewing pornographic websites, that the victim had engaged in "sexually inappropriate" behavior with a friend, and that the victim had hidden in her mother's closet while her mother and the petitioner "were being intimate." The court noted that trial counsel utilized the letter when questioning the victim's mother but concluded that counsel "never introduced this letter into evidence at trial" and that "he never even properly impeached" her with the contents of the letter.

Initially, it is not clear from the record that the document in question would have been admissible had counsel sought its introduction into evidence at trial. The entirety of the letter is hearsay, and the petitioner presented no evidence to suggest that the letter would have fit within an exception to the rule excluding hearsay. The record does not establish that the letter would have been admissible as a prior inconsistent statement pursuant to evidence rule 613 because its contents are not inconsistent with the witness's trial testimony. The victim's mother admitted that she had initially believed the petitioner's version of events and doubted that version provided by the victim, that she thought the victim's version of events was "odd" and "strange," and that the victim repeated her allegations "in a completely normal tone of voice." During cross-examination, she acknowledged that the victim provided multiple versions of her story and "couldn't keep her stories straight." Moreover, the victim's mother readily admitted at trial that she did not believe the victim initially and "that the victim was jealous of her relationship with the [petitioner]." *Nicholas Keith Phillips*, slip op. at 4.

Although counsel did not attempt to introduce the letter into evidence, he questioned the witness with its contents, and she admitted having made the statements contained within the letter. Thus, even assuming for the sake of argument that the letter did qualify as a prior inconsistent statement, the letter itself would not have been admissible because "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b); *see State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (confirming that "extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement"); *see also* Tenn. R. Evid. 803(26), Advisory Comm'n Comments ("To be considered as substantive evidence

-12-

the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.").

Finally, although trial counsel did not attempt to introduce the letter into evidence, he was able, through his questioning of the victim and her mother, to bring most of the information in the letter to the attention of the jury. For example, in addition to the admissions by the victim's mother noted above, during cross-examination, the victim herself admitted that she had hidden in her mother's closet while her mother and the petitioner were engaging in sexual relations. Under these circumstances, the petitioner cannot establish that he was prejudiced by counsel's handling of the letter.

The post-conviction court also concluded that trial counsel's cross-examination of the victim was deficient because he failed to introduce into evidence "multiple statements, via letters, that amounted to multiple versions of the testimony she was giving at trial." The primary problem with the post-conviction court's ruling in this regard is that the petitioner failed to present at the evidentiary hearing a single letter written by the victim, let alone multiple letters written by the victim that were inconsistent with her trial testimony. At trial, the victim acknowledged that she was jealous of her mother's relationship with the petitioner and that she had often thought that her mother would spend more time with her if the petitioner were out of the picture. The victim also admitted that she had told several different versions of the offenses over the course of time. When trial counsel attempted to refresh her recollection with letters she had written, the victim acknowledged having written the letters, and, when asked about specific information contained therein, she fully acknowledged having made the statements. Thus, for the reasons outlined above, the letters themselves would not have been admissible. Additionally, other witnesses confirmed that the victim had given multiple accounts of the offense prior to trial. Consequently, the petitioner did not establish either deficient performance in counsel's cross-examination of the victim or prejudice flowing therefrom.

The trial record in this case evinces some struggles of trial counsel, and, accordingly, the post-conviction court's frustration with trial counsel's representation is understandable. A post-conviction proceeding, however, is a collateral attack upon the conviction judgments in which the petitioner bears a burden of proof as we have illustrated above. A grant of post-conviction relief must be predicated upon the fulfillment of this burden, which, in this case, the petitioner failed to accomplish.

*Conclusion*

In sum, the evidence preponderates against the findings of the post-conviction court that trial counsel performed deficiently and that his deficient performance prejudiced the petitioner. Accordingly, we reverse the ruling of the post-conviction court and vacate the order granting post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE